## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

───────────────────

FELIZ RAEL,
on behalf of Juan James Cordova,
estate of Juan James Cordova

       Plaintiff,

      vs.                                No. 1:23-cv-00875-KWR-JFR

CITY OF ALBUQUERQUE, *ET AL.*,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court upon a Motion for Summary Judgment based on Qualified Immunity, filed November 13, 2023, by Defendants, City of Albuquerque and Bryce Willsey.  Doc. 20.  Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well taken and therefore, is **GRANTED IN PART**.

## BACKGROUND

Plaintiff's claims arise from actions taken by Defendant Willsey during an armed standoff between Mr. Juan James Cordova and Albuquerque Police that resulted in Mr. Cordova's death.  Doc. 31 at 1.  The decedent was fatally shot by Albuquerque Police, specifically Officer Willsey, on April 21, 2021.  *Id*.  Upon Mr. Cordova's death, Plaintiff, on behalf of the decedent and his estate, brought this action in state court.  On September 25, 2023, Plaintiff filed a "First Amended Complaint for Civil Rights Violations Pursuant to 42 U.S.C. § 1983 and Violations of the New Mexico Tort Claims Act."  Doc. 1, Ex. B.  In Plaintiff's Amended Complaint, Plaintiff alleges:

Count I: Excessive Force by Use of Deadly Force in Violation of the Fourth Amendment

Pursuant to 42 U.S.C. § 1983 Against Defendant Willsey

Count II: State Tort Claims Against Defendant Willsey

Count III: Negligent Use of Equipment Against Defendant Willsey

Count IV: Negligent Hiring, Training, and Supervision Pursuant to The New Mexico Tort

Claims Act Against the City.

*See Id*. at 15-18.  Defendants removed this case asserting Plaintiff's claims are subject to the

jurisdiction of this Court pursuant to 28 U.S.C. § 1331, 1343(a), and 1983.  Doc. 1 at 2.

## FACTS[1]

On April 21, 2021, at approximately 9:50 P.M., Susan Vasquez called 911 and reported

that her boyfriend, Juan Cordova, pulled a gun on her at her residence located at 10416 Coyote

Canyon.  Defendants' UMF 1, Doc. 20, Ex. A at 2:1-11 and 8:3-12.  Vasquez claims Cordova

told her that if she called the police, he was going to "fucking shoot himself."  *Id*.  Vasquez told

the 911 operator she was scared and going to her neighbor's house.  Defendants' UMF 2, Doc.

20, Ex. A at 4:17-20.  Vasquez called 911 because Mr. Cordova put a gun to his head, fired it,

and based on his facial expression, Vasquez believed Cordova did not mean to pull the trigger.

Plaintiff's UMFs A and B, Doc. 31, Ex. 1 at 31:7-9, 44:8-17.  According to Plaintiff, Mr.

Cordova did not threaten Vasquez with a gun before she called 911, and she was not afraid

Cordova was going to hurt her.  Plaintiff's UMFs C and D, Ex. 1 at 45:3-16, 46:21-25, 47:1-3.

APD Officers Kevin Beem, Bradley Agner, Bernadette Sanchez, Acting Sergeant David

Griffin, and Acting Lieutenant Matthew Chavez were dispatched between 9:54 P.M. and 10:00

P.M. to the scene of the call made by Vasquez.  Defendants' UMF 3, Ex. B at 21:54:11,

---

[1] The Court has determined the relevant facts based on the parties' submissions, while omitting extraneous detail, party arguments, and facts not supported by the record.  Disputes concerning the facts are noted.

21:55:46, 22:00:08, 22:00:16.  Due to the dangerous nature of the call, officers first met at a nearby park, Ventana West Park, to discuss tactics and a plan of approach.  Defendants' UMF 4, Ex. E at 15:12-16:25, Ex. H at 13:10-13.  Acting Lieutenant Chavez's plan was to set up an array of force with both lethal and non-lethal options.  Defendants' UMF 5, Ex. B at 22:07:19, Ex. E at 16:19-17:6, Ex. H at 13:10-22.  This plan also sought to establish communication with Vasquez because she had a visual of Cordova though her Ring camera video stream.  *Id*.  At the park, Officer Agner called Vasquez to gather information.  Defendants' UMF 6, Ex. K at 00:30-01:50, Ex. E at 17:2-6.  Vasquez stated that Cordova shot sunglasses on the top of his head, but that she did not feel threatened.  *Id*.  Vasquez told Officer Agner that after Cordova had fired the gun, Cordova said he could take them both out and that he was not going out alive.  Defendants' UMF 7, Ex. K at 01:50-02:07.  Vasquez explained to Officer Agner that once she told Cordova she was going to call the police, Cordova said he would engage them because he wanted to shoot himself or be shot.  Defendants' UMF 8, Ex. K at 03:06-03:36.  After speaking with Vasquez, Officer Agner relayed to officers on the scene that she did not feel threatened but had gone to a neighbor's house after the shot was fired.  Defendants' UMF 9, Ex. E at 19:4-20:9.  Officer Agner further conveyed that Cordova did make some potentially suicidal statements or actions.  *Id*.  Acting Lieutenant Chavez relayed over the radio that Cordova had made potentially suicidal statements, aggravated assault with a deadly weapon, and that officers would not engage in a pursuit if Cordova fled.  Defendants' UMF 10, Ex. B at 22:12:16, Ex. C at 8:17-22.  Lt. Chavez planned on setting up a perimeter and attempted to contact Cordova.  Defendants' UMF 11, Ex. H at 20:18-19.

The CAD reflects that Officer Sanchez requested additional officers on the scene.  Defendants' UMF 12, Ex. B at 22:19:13, 22:19:16, 22:20:09; Ex. C at 9:14-15.  Officers Justin

Rogillio, Kelsie Saul, and Cacy Shultz promptly dispatched. *Id.* At approximately 10:22 PM, Lt. Chavez asked dispatch to relay the following message over the radio:

> Subj[ect] put gun to head threatening 43-1, clr [caller] did not feel threatened by gun. Was trying to stop subj[ect]. Subj[ect] did advise that he will engage w[ith] 34s and will not come out of this alive. Developing a plan to 21 the subj[ect].

Defendants' UMF 13, Ex. B at 22:22:40; Ex. C at 9:21-10:6. Officer Sanchez was dispatched to the scene at approximately 10:22 P.M. Defendants' UMF 14, Ex. B at 22:22:01 and 22:29:46; Ex. C at 12:2-7, Ex. J. Sgt. David Griffin requested that he stage at the intersection of Coyote Canyon and Sand Springs to block northbound traffic. *Id.* Sgt. Griffin told Officers Rogillio and Shultz to stage at Corn Mountain and Coyote Canyon. Defendants' UMF 15, Ex. B at 22:30:51, Ex. C at 12:9-15, Ex. J. Officer Rogillio voiced over the radio that he was going to the Coyote Canyon and Corn Mountain intersection, with Officer Sanchez stating he was at the intersection of Coyote Canyon and Sand Springs. Defendants' UMF 16, Ex. B at 22:31:26, 22:31:39; Ex. C at 13:12-13, 13:24-25; Ex. J. Officers Agner, Beem, Sanchez, Sgt. Griffin, and Lt. Chavez left the park and proceeded to Pony Hills Place NW. Defendants' UMF 17, Ex. C at 13:7-8, Ex. J, Ex. H at 17:3-10, Ex. M at 00:00-00:30, Ex. T at 00:00-00:40. Officer Sanchez relayed over the radio that Cordova's vehicle was a blue Chevrolet Silverado pickup truck. Defendants' UMF 18, Ex. T at 01:42-01:50.

Lt. Chavez relayed over the radio for any unit that was close to the 10416 Coyote Canyon residence to use "48" (caution) because Cordova exited the home and may have been walking around the area. Defendants' UMF 19, Ex. C at 14:16-20, Ex. H at 54:18-20, Ex. M at 03:15-03:28. Officer Rogillio stated on the radio that he could only see the rear of Cordova's truck because the rest of it was hidden by the house. Defendants' UMF 20, Ex. B at 22:43:29, Ex. C at 17:1-3, Ex. S at 05:38-05:46. Lt. Chavez attempted to communicate with Cordova via his cell

phone, but Cordova did not answer.  Defendants' UMF 21, Ex. N at 00:00-02:35.  Officer

Rogillio, positioned at the intersection of Corn Mountain and Coyote Canyon, approached a

vehicle travelling eastbound on Corn Mountain to ask which direction the driver was headed.

Defendants' UMF 22, Ex. S at 08:10-08:25, Ex. U at 05:12-05:35.  When the driver continued on

his or her way on Corn Mountain, Officer Rogillio returned to where he was staged with Officer

Shultz, when Officer Shultz yelled out, "pointing a gun."  Defendants' UMF 23, Ex. S at 08:34,

Ex. U at 05:35-05:40.

Officer Shultz stated on the radio, "[s]ubject is outside pointing a gun at 34s [officers]."

Defendants' UMF 24, Ex. U at 05:45-05:44, Ex. M. at 02:44-02:46.  (Plaintiff does not dispute

Defendants' asserted fact, however, clarifies that the CAD report states, "pointing gun towards

34, gun is now at his side."  *See* Doc. 31 at 3; Ex. B at 5, 22:47:23).  Shortly after Officer Shultz

relayed "subject is outside pointing a gun at 34 (officers)", Lt. Chavez drove his police car

further down Pony Hills as Officers Sanchez, Beem, and Agner walked down the street with the

car.  Defendants' UMF 25, Ex. T at 11:24-11:56.  As the officers walked on Pony Hills, Officer

Sanchez stated to Officer Beem, "[h]old here; hold here because he can see us right through the

branches right here Beem."  Defendants' UMF 26, Ex. T at 11:43-11:46.  Lt. Chavez parked his

police car in front of a home on the northwest corner of the intersection of Coyote Canyon and

Pony Hills.  Defendants' UMF 27, Ex. F at 188:3-25, Ex. J, Ex. W at 01:33-01:42.  Once the

police vehicle was parked, Officer Beem told Officer Sanchez that he did not see Mr. Cordova,

so she pointed him out.  Defendants' UMF 28, Ex. M at 11:54-11:58, Ex. T at 12:00-12:04.  Due

to the tree foliage in the yard of the house on the northwest corner of Coyote Canyon and Pony

Hills, Officer Beem was unable to get a clear visual of Cordova in order to provide lethal

coverage.  Defendants' UMF 29, Ex. M at 11:58-12:01, Ex. G at 29:13-30:3, 54:21-55:11.  After

parking the police car, Officers Agner and Sanchez made announcements to Cordova, telling him

they were APD officers and directed him to drop the weapon and everything in his hands.

Defendants' UMF 30, Ex. L at 12:06-13:19, 13:49-14:01, 31:57-32:32, 37:08-37:39, 38:16-

39:29, 39:31-39:57; Ex. T at 15:09-15:26, 15:33-15:47, 16:04-16:33, 16:49-17:05, 18:19-18:50,

24:33-25:38.  Officers Agner and Sanchez instructed Cordova to place his hands above his head

and walk towards the officers with his hands free and clear.  *Id*.  Officers told Cordova that if he

followed their commands, this would guarantee his safety, but if he did not, then force would be

used against him.  Defendants' UMF 31, Ex. T at 25:45-25:50.  Officers Sanchez and Agner

announced a police emergency directing nearby residents to stay inside their homes and call 911

in case of emergency.  Defendants' UMF 32, Ex. L at 14:09-14:34; Ex. T at 14:56-15:07, 17:18-

18:02, 21:00-21:19.  At 10:47 P.M., Officer Shultz stated over the radio that Cordova was

pointing the gun north towards them, but right now it was at his side.  Defendants' UMF 33, Ex.

B at 22:47:23, Ex. C at 17:17-19, Ex. U at 06:30-06:38.

Officers Shultz and Rogillio had Officer Saul move a police vehicle to the intersection of

Corn Mountain and Coyote Canyon to block traffic.  Defendants' UMF 34, Ex. S at 11:03-11:29,

Ex. U at 08:06-08:32, 09:45-09:55.  However, after Officer Saul moved the vehicle, officers

positioned themselves at the fence of a residence located on the corner of Corn Mountain and

Coyote Canyon since officers believed Mr. Cordova was targeting them.  *Id*.  (Plaintiff does not

genuinely dispute that Mr. Cordova was targeting officers.  Plaintiff's dispute challenges that Mr.

Cordova was targeting officers, but not officers' belief Mr. Cordova was targeting them.  Doc.

31 at 3 citing, Ex. U at 09:51-54, UMF 24, Exs. X and Y.)  At approximately 10:51 P.M., Officer

Shultz stated on the radio, "[s]ubject is yelling for 34s to shoot him."  Defendants' UMF 35, Ex.

B at 22:51:52, Ex. U at 11:02-11:04.  After the initial call out, and before Officer Willsey arrived

at the scene, dispatch at time 22:22:40 provided an update about what occurred, stating that Mr. Cordova had put the gun to his head threatening suicide, and Ms. Vasquez did not feel threatened by the gun. Plaintiff's UMF E, Ex. B at 3. Officers Lopez, Willsey, and King arrived on the scene to assist, with Officer Willsey arriving at the scene approximately 34 minutes after dispatch's update at 22:56:50. Defendants' UMF 36, Ex. B at 22:56:50, 22:58:41; Plaintiff's UMF E, Ex. B at 5, Ex. 2 at 93:17-20. Officer Willsey was first notified of the emergency situation when an alert tone was relayed over the radio and when dispatch stated that a caller reported that her boyfriend was armed with a gun, had fired it inside the house without hitting anyone, and the boyfriend pointed his firearm at officers. Defendants' UMF 37, Ex. F at 71:10-13, 86:14-87:2. (Plaintiff asserts Mr. Cordova did not point a firearm at officers; however, this does not create a genuine issue of material fact as to UMF 37; *see* Ex. F at 71:10-10.) Lt. Chavez, the highest-level supervisor on the scene, after hearing Ms. Vasquez's explanation, stated, "[i]t doesn't look like we have a felony agg assault with a deadly weapon if she didn't feel threatened. So right now, we have possible negligent use of a firearm." Plaintiff's UMF F, Ex. E at 19:17-20. (Defendants do not dispute this statement, but argue it was conveyed over the dispatch, radio transmissions on the CAD, or information conveyed to Officer Willsey. Doc. 33 at 10.) Officer Willsey does not remember hearing or seeing information that Mr. Cordova had threatened suicide or that Vasquez reported that she did not feel threatened. Plaintiff's UMF G, Ex. F at 88:5-25, 89:1-19. Approximately nine minutes before Officer Willsey arrived on the scene, it was reported that Mr. Cordova briefly pointed his gun at officers and then put the gun at his side. Plaintiff's UMF H, Ex. B at 4, 22:47:23. Mr. Cordova's pointing a gun at officers did not result in officer use of force before Willsey arrived on the scene. Plaintiff's UMF I, Ex. F at 71:10-72:5. Upon arriving on the scene, Officer Willsey deployed with his rifle and contacted

Lt. Chavez to discuss positioning.  Defendants' UMF 38, Ex. F at 170:17-171:5; Ex. N at 17:31-18:48; Ex. V at 3:47-5:02.  While Lt. Chavez and Officer Willsey were speaking near the police car, Officer Sanchez advised officers "use 48" (caution) because Mr. Cordova was pointing with the gun in his hand.  Defendants' UMF 39, Ex. T at 26:36-39; Ex. N at 17:57-59; Ex. V at 4:05-08.  Lt. Chavez testified that although he did not see Mr. Cordova pointing a gun, it was Officer Rogillio who said via radio that Mr. Cordova pointed a gun at officers.  Plaintiff's UMF J, Ex. 3 at 32:15-33:3.

Officer Sanchez warned officers about Mr. Cordova pointing a gun because she could see he was pointing the firearm at officers.  Defendants' UMF 40, Ex. H at 54:17-55:17; 57:20-21; 58:3-5; Ex. T at 26:43-26:50; Ex. T1 at 26:43.  (Plaintiff does not genuinely dispute that Officer Sanchez warned officers, but contests whether Mr. Cordova was pointing his firearm at officers. *See* Doc. 31 at 4 citing, Ex. T at 26:43-26:50).  Subsequently, Officer Sanchez exited the vehicle and drew her gun.  *Id*.  Officer Sanchez told Lt. Chavez, in the presence of Officer Willsey, that she exited the police vehicle because she had a direct line of sight with Mr. Cordova and could see him pointing the gun.  Defendants' UMF 41, Ex. T at 26:43-26:50, Ex. N at 18:03, Ex. V at 04:12-04:19.  Officer Willsey was aware that Officer Sanchez made the comment about concern for her safety as she exited the vehicle due to her seeing Mr. Cordova with the gun.  Defendants' UMF 42, Ex. F at 112:16-113:1.  (Plaintiff does not genuinely dispute Defendants' factual assertion and denies Officer Sanchez made the comment out of safety concerns.  Doc. 31 at 4 citing, Ex. T at 26:48-54, Ex. F at 112:20-113:1).  Plaintiff asserts Officer Rogillio was roughly 50 yards away from Mr. Cordova.  Plaintiff's UMF K, Ex. 3 at 33:23-34:6, 33:10-17; 33:15-17; Ex. 5 at 8-9; Ex. 6 at 29:25-30:1-16.  The other officers were also located a similar distance away with "pretty good cover and concealment" at their locations.  *Id*.  Officers spent over two hours

8

behind covered positions such as squad cars, trees, and bushes as they attempted to communicate with Mr. Cordova. *Id*. Despite these distances, officers with a line of sight towards Mr. Cordova could see him because of the illuminated garage behind him. *Id*. (Defendants genuinely dispute Plaintiff's UMF K as misleading. Defendants genuinely dispute the testimony Plaintiff cites in UMF K is from before officers moved closer after it had been announced Mr. Cordova pointed a firearm at officers. *See* Doc. 33 at 10-11 citing Ex. E at 37:23-38:4; Ex. 3 at 32:25-33:3. Defendants assert Lt. Chavez's distance estimations as to the distance from Mr. Cordova is speculative and not within his knowledge. Ex. B at 22:47:23. Defendants further state Plaintiff's citation to an expert's report contains inconsistencies with undisputed material facts (UMFs 3, 4, 17, 66, 67, and 68)). Plaintiff asserts when Officer Rogillio could see Mr. Cordova, Cordova pointed the firearm in different positions – sometimes up, down, across the street – and used it as a pointer to point at things in different directions or that he was negligently pointing it across the street, but it did not seem like he was pointing it at a person or thing as if to fire upon it. Plaintiff's UMF L, Ex. 4 at 25:6-15, 41:11-45:8. (Defendants argue Plaintiff's UMF L is misleading and taken out of context. *See* Doc. 33 at 13-14 citing, Ex. AA at 23:2-24:2, Ex. 4 at 25, 44:4-11.) Plaintiff argues Officer Rogillio testified that after Mr. Cordova fired a shot at 11:04:42 PM while outside his truck in the driveway, he saw dust kick up from the ground, which caused him to believe Cordova had fired a shot into the ground. Plaintiff's UMFs M, R; Ex. 4 at 26:2-16; Ex. X at 3:56-4:00. (Defendants do not genuinely dispute Plaintiff's UMF M, arguing Plaintiff misstates testimony; *see* Doc. 33 at 14 citing, Doc. 31-4, Ex. 4 at 26:3, 26:8-11). Plaintiff asserts when Mr. Cordova discharged the firearm, he was not firing at police, but appears to have accidentally discharged it towards the garage. Doc. 31 at 10, Plaintiff's UMF S. (Defendants genuinely dispute UMF S and argue although the Ring footage does not depict

where Mr. Cordova was pointing the firearm, it is apparent this was not accidental from the sound of him racking the firearm and afterwards stating "You hear that, bitch?" *See* Doc. 33 at 5-6 citing, Doc. 21, Ex. X at 03:56-03:57, 04:00-04:01).

Plaintiff states Lt. Chavez testified he was behind his police truck with Officer Griffin about 50 yards away from Mr. Cordova to set up in a safe location and call SWAT or a crisis team for assistance or to take over. Plaintiff's UMFs N and O, Ex. 3 at 33:23-34:14, 36:11-39:11, 42:19-43:12; Ex. 13. Plaintiff asserts based on his assessment of the scene, Lt. Chavez called Lt. Del Grecco, who oversaw SWAT, to have them take over the situation. (Defendants genuinely dispute and argue Lt. Chavez's testimony as to the distance he and other officers were when Mr. Cordova pointed the firearm is speculative. Doc. 33 at 14. Defendants also claim Plaintiff fails to mention Lt. Chavez's testimony regarding calling SWAT and CNT refers to a point in time before Officer Sanchez saw Mr. Cordova pointing a gun at officers and before Cordova had fired a shot. Defendants argue Plaintiff fails to mention Lt. Chavez's testimony that SWAT and CNT were going to be contacted once Mr. Cordova's actions escalated to a felony offense. Doc. 33 at 14-15 citing Ex. 3 at 42:19-25.) Officer Willsey heard Lt. Chavez call for SWAT and a crisis team. Plaintiff's UMF P, Ex. 2 at 68:15-23. Officer Willsey knew that if SWAT was called, they would take control of the situation. Plaintiff's UMF Q, Ex. 2 at 70:13-71:9. Officer Willsey testified that SWAT had "less lethals" such as the "Rook," mobile shields, "BearCat," tear gas, and OC canisters, which could be used to subdue and arrest Mr. Cordova without having to kill him. *Id*.

There was nothing restricting Mr. Cordova's movements that could have prohibited him from confronting officers and engaging them in gunfire. Defendant's UMF 43, Ex. F at 189:13-190:9; Ex. G at 100:23-101:6. (Plaintiff does not genuinely dispute this, arguing Mr. Cordova

was barricaded at the time because he was intoxicated, positioned behind his truck, and with numerous police vehicles, trees, walls, and houses providing cover for officers.  Doc. 31 at 4-5 citing, Ex. 5 at 9, 18.  Plaintiff states Mr. Cordova did not move more than a few feet along his truck during the encounter.  Ex. X at 00-10:05, Ex. Y at 00-04:14.)  Police did not evacuate the residential neighborhood.  Defendants' UMF 44, Ex. F at 190:10-14.

Shortly after Officer Sanchez exited the police car, Officer Willsey walked through the yards of homes on the south side of Pony Hills to find a better line of sight of Mr. Cordova to provide lethal coverage for officers.  Defendants' UMF 45, Ex. F at 176:2-10, Ex. V at 05:02-07:02.  Officer Willsey positioned himself at a house on the southeast corner of the Coyote Canyon and Pony Hills intersection.  Defendants' UMF 46, Ex. F at 173:18-174:4, Ex. 48.  When Officer Willsey moved for cover between an RV and a black truck parked at the residence in Ex. 48, Mr. Cordova fired a gunshot.  Defendants' UMF 47, Ex. F at 180:18-181:5, 181:20-182:11, Ex. V at 07:19-07:22.  Officer Willsey believed Mr. Cordova had seen him move alongside the truck and in response, fired the shot at him.  Defendants' UMF 48, Ex. F at 178:1-179:11, 182:3-11.  (Plaintiff does not genuinely dispute Defendants' asserted fact.  *See* Doc. 31 at 5 citing, Ex. F at 178:20-24, 179:10-11; Ex. 2 at 76:4-11.)  Officer Sanchez, kneeling by the police car's passenger side tire, was startled by the gunshot.  Defendants' UMF 49, Ex. H at 58:21-59:19, Ex. M at 29:49.  A screenshot from Officer Sanchez's camera with a timestamp of 23:10:48 depicts a driveway and light emanating from the garage of 10416 Coyote Canyon Place NW, the residence where Mr. Cordova was located.  Defendants' UMF 50, Ex. H at 64:18-65:9, Ex. I.  Ring camera footage from a nearby residence depicts Mr. Cordova firing a shot.  Defendants' UMF 51, Ex. X at 03:58-03:59.  Defendant Willsey did not see Mr. Cordova discharge the firearm.  Plaintiff's UMF T, Ex. 2 at 76:4-11.  None of the officers present returned

fire or attempted to use force on Mr. Cordova after the discharge.  Plaintiff's UMF U, Ex. 2 at

76:12-25; Defendant's UMFs 48, 52, 53.  Officer Willsey had no information to believe Mr.

Cordova had fired at officers.  Plaintiff's UMF V, Ex. 2 at 77:1-24.  After Mr. Cordova

discharged the firearm, he kept the firearm in his hand starting at 23:05:57 P.M., and walked

closer to the tailgate of the pickup, away from the cab, where he was more visible to police, but

no officer fired on him or attempted to use force.  Plaintiff's UMF W, Ex. X at 5:10-5:21.

(Defendants dispute in part with insufficient citation to the record.  *See* Doc. 33 at 15 citing, Doc.

21, Ex. X.)  During this time, Mr. Cordova cannot be seen pointing the firearm at officers.

Plaintiff's UMF X, Ex. X at 5:10-5:21.  The firearm can be seen in Mr. Cordova's right arm as

he held it down at 23:06:07 P.M.  Plaintiff's UMF Y, Ex. X at 5:23.  Mr. Cordova then said at

23:06:14, "Shoot, bitch!", but did not point the firearm at or verbally threaten police.  Plaintiff's

UMF Z, Ex. X at 5:31.  Mr. Cordova at 23:06:20 then waives the firearm horizontally across his

body but does not verbally threaten police.  Plaintiff's UMF AA, Ex. X at 5:35-5:38.  No officer

fired upon Mr. Cordova in response to this statement and action, and no force was used.

Plaintiff's UMF BB, Ex. X at 5:31-5:45.  Plaintiff asserts no officer reported that Mr. Cordova

was pointing the firearm at officers at this time, or any other time than at 23:47:23.  Ex. B at 4-5,

22:47:23-23:16:15.  (Defendants genuinely dispute in part, stating that Officer Sanchez told

officers to "use 48" (caution) because Mr. Cordova was pointing a gun.)  Mr. Cordova returned

to the truck cab and put the firearm into the truck.  Plaintiff's UMF CC, Ex. B at 5:45-6:19.

      With Mr. Cordova moving back and forth to his truck, Officer Sanchez's view of him

was obstructed by a tree and could not get a clear sight picture.  Defendants' UMF 52, Ex. H at

59:20-60:13.  When Mr. Cordova fired a round, Officer Sanchez did not fire a shot.  *Id*.

(Plaintiff does not dispute but adds that the truck Mr. Cordova stood behind was also an

obstruction.  Doc. 31 at 6 citing, Ex. H at 60:8-10.  Plaintiff does not genuinely dispute that Officer Sanchez did not shoot because of visual obstructions.)  Upon hearing the shot and seeing a flash of the round shot by Mr. Cordova, Officer Beem did not fire his gun because of visual obstructions.  Defendants' UMF 53, Ex. G at 89:22-90:6, 97:5-21.  (Plaintiff does not genuinely dispute but argues that visual obstructions were the reason Officer Beem held his fire.  Doc. 31 at 7 citing, Ex. G at 89:22-90:6, 91:9-22, 97:5-21.)  When Officer Beem saw the flash from the fired round, he saw a tree shake and dust come up from the ground of the residence at 10416 Coyote Canyon Place NW.  Plaintiff's UMF 54, Ex. G at 97:22-99:3; Ex. D at 23:19:31.  After Mr. Cordova fired the round, Officer Sanchez announced to the other officers, "He's walking towards us."  Defendant's UMF 55, Ex. T at 31:10, 31:11.  After Officer Sanchez announced this, Lt. Chavez told Officer Agner to make further commands to Mr. Cordova.  Plaintiff's UMF 56, Ex. L at 31:41-32:32; Ex. V at 06:07-06:42; Ex. X at 06:07-06:42.  To which, Officer Agner complied.  *Id*.  Mr. Cordova responded to Officer Agner by cursing at him and yelling "shoot!"  Defendants' UMF 57, Ex. V at 10:05, Ex. X at 06:07-06:42.  At approximately 11:07 P.M., Lt. Chavez relayed the following message via radio, "Also, just to update, subject did fire one round. I don't know where.  He is advising that we'll have to take him out in a body bag.  Not responding to any of our commands.  Still in a driveway armed with a weapon."  Defendants' UMF 58, Ex. B at 23:09:11, 23:09:49; Ex. C at 20:11-15; Ex. L at 33:06-33:17.  In response to officers' commands, Mr. Cordova shouted at police to shoot and stepped away from the truck door, where he was seen without a gun.  Plaintiff's UMF DD, Ex. B at 6:19-6:31.  Mr. Cordova's right hand was empty, and his left hand had his phone to his ear but did not threaten police.  *Id*. Mr. Cordova then walked towards the truck tailgate, closer to police, and shouted at them while unarmed but did not shout any intention to harm police.  Plaintiff's UMF EE, Ex. B at 6:38-6:57.

Plaintiff asserts Mr. Cordova remained unarmed for approximately seven and a half minutes, from 23:07:03 to 23:14:37, before picking up his firearm again. Plaintiff's UMF FF, Ex. B at 6:57-09:05; Ex. Y at 00:00-01:56, 02:47, 3:33-3:38, 3:49. (Defendants genuinely dispute this, stating it is unknown whether Mr. Cordova had possession of the firearm during portions of the video footage when his hands and/or body were obstructed by the truck door. Doc. 33 at 15-16 citing, Doc. 21, Ex. X at 23:07:03-23:07:14; 23:07:43-23:07:25; 23:07:36-23:09:49; Ex. Y at 23:10:56-23:12:13).

At approximately 11:11 P.M., Officer Willsey instructed officers over the radio to continue commands to Mr. Cordova. Plaintiff's UMF 59, Ex. L at 36:58-36:39; Ex. O at 00:23-00:25; Ex. V at 14:31-14:32. After this request, Officer Agner gave Mr. Cordova additional commands. Defendants' UMF 60, Ex. L at 37:08-39:58; Ex. V at 14:41-17:30. Throughout these commands, Mr. Cordova yelled several times, "fuck you" and "shoot." Defendants' UMF 61, Ex. V at 14:41-17:30. Officer Willsey heard Mr. Cordova state that he had a 1911 and a .45 and that he was going to call his mother and end it all. Defendants' UMF 62, Ex. F at 118:22-119:3. (Plaintiff genuinely disputes in part Defendants' assertion that Mr. Cordova stated he had extra magazines or more rounds, which is not supported in the record. Doc. 31 at 7 citing, Ex. Y at 3:50-3:56.) After Mr. Cordova obtained his firearm again, he held it straight up, explaining that he had a .45 and asked police to shoot him. Plaintiff's UMF GG, Ex. Y at 3:50-4:01. Plaintiff claims Mr. Cordova did not threaten to shoot police and continued holding his firearm in the air. *Id.* Plaintiff claims Mr. Cordova then walked towards his truck's tailgate and remained behind the truck with the firearm pointing away from the police towards the garage, repeatedly yelling "shoot!" Plaintiff's UMF HH, Ex. Y at 4:01-4:03. (Defendants genuinely dispute Plaintiff's UMFs GG and HH, and argue these actions were taken out of context and

contain prior omissions from Mr. Cordova.  Doc. 33 at 16 citing Ex. Y at 01:27-01:28, 00:22-00:29, 00:34-00:36, 02:01-02:20, 03:22-03:40.  Exs. 46 and 47.  *Id.*)

Officer Willsey states he saw Mr. Cordova, through the optic magnifier on his rifle, raise his firearm towards the officers next to the police vehicle.  Defendants' UMF 63, Ex. F at 110:3-6, 167:7-14.  Because of this, Officer Willsey decided to fire his rifle.  *Id.*  (Plaintiff does not genuinely dispute Defendants' version of events.  Doc. 31 at 7-8 citing, Ex. X at 5:45-9:05; Ex. Y at 00:00-4:06, 3:50-4:05.)  Plaintiff claims Mr. Cordova, not making any threats to harm police, put his firearm down towards his side and continued yelling, "shoot!", when Officer Willsey fatally shot him.  Plaintiff's UMF II, Ex. Y at 4:04-4:06.  (Defendants genuinely dispute Plaintiff's claim, *see* Defendants' objections to Plaintiff's UMFs GG and HH.)  Defendant Willsey states that at the moment he shot Mr. Cordova, Cordova was raising his firearm towards the officers down the street.  Plaintiff's UMF JJ, Ex. 2 at 55:3-9.  Willsey claims Mr. Cordova was pointing, but not firing the gun towards the officers positioned near the police truck. Plaintiff's UMF KK, Ex. 2 at 59:23-60:2, 73:6-10.  Officer Willsey further states Mr. Cordova "cleared" the truck in the driveway, walked towards officers, and raised his firearm in their direction.  Plaintiff's UMF LL, Ex. 2 at 60:3-61:11.  By "clearing" the truck, Defendant Willsey claims Mr. Cordova walked forward, away from the truck, towards the front of the driveway. Plaintiff's UMF MM, Ex. 2 at 62:1-5.  Before shooting Mr. Cordova, when Officer Willsey claims Cordova was pointing a firearm at officers after "clearing" the truck, Willsey could see him through his EOTech holographic optic with a three times magnifier, which enhanced his vision.  Plaintiff's UMF NN, Ex. 2 at 79:8-25, 80:20-23.  Officer Willsey states the reason he shot Mr. Cordova was because Cordova was presenting a deadly threat to officers.  Plaintiff's UMF OO, Ex. 2 at 55:3-6.  Officer Willsey states that at the moment he shot Mr. Cordova, he

saw Cordova "raising his firearm toward the officers that were down the street."  Plaintiff's UMF

PP, Ex. 2 at 53:7-9.  Plaintiff then asserts in the moments immediately preceding and when

Officer Willsey fired, Mr. Cordova was pointing his firearm down and away from the officers.

Plaintiff's UMF QQ, Ex. 5 at 17.  (Defendants genuinely dispute.  *See* Doc. 20-14, Ex. 46 and

Doc. 20-15, Ex. 47.)  Plaintiff asserts based on these circumstances, Officer Willsey's use of

deadly force was not in compliance with acceptable law enforcement training, policy, and

procedures.  Plaintiff's UMF RR, Ex. 5 at 8, 13-20.  (Defendants genuinely dispute Plaintiff's

asserted fact as opinion testimony in noncompliance with D.N.M. LR Civ. P. 56.1(b).  *See* Doc.

33 at 17-20.)  Plaintiff asserts at no time after Mr. Cordova discharged the firearm and before he

was shot by Officer Willsey did he point the firearm at officers or threaten to shoot officers.

Plaintiff's UMF SS, Ex. X at 5:45-9:05; Ex. Y at 00:00-4:06.  (Defendants genuinely dispute.

*See* Doc. 33 at 17-18, 20.)  Plaintiff asserts when Defendant Willsey shot Mr. Cordova, the

closest officers were over fifty yards away from him and behind cover.  Plaintiff's UMF TT, Ex.

3 at 33:15-34:14, 36:11-39:11; Ex. 13; Ex. 5 at 8-9.  (Defendants genuinely dispute as

misleading, speculative, and unsupported by the record.  *See* Doc. 33 at 20.)  Plaintiff argues that

according to Officer Willsey's own estimation, he was positioned about fifteen yards further than

the closest officers were.  *Id.;* Ex. 2 at 174:20-24. (Defendants genuinely dispute as misleading,

speculative, and unsupported by the record.  *See* Doc. 33 at 20.)  Besides Officer Willsey,

Plaintiff states no other officer used deadly force on Mr. Cordova at any point.  Plaintiff's UMF

TT citing, Exs. X and Y.

A screenshot from Officer Willsey's OBRD footage at 23:15:13 shows the position of the

police vehicle the officers were next to when Officer Willsey used deadly force.  Defendants'

UMF 64, Ex. F at 188:1-25; Ex. 49.  When Officer Willsey decided to fire his rifle, Mr. Cordova

is seen in screenshots of Ring video footage taken from the residence of 10416 Coyote Canyon

Place NW (23:14:49 and 23:14:50).  Defendants' UMF 65, Ex. F at 167:15-25.  On OBRD video

footage from cameras on Officers Sanchez and Willsey, a rifle firing is heard at 23:14:49.

Defendants' UMF 66, Exs. T and V.  OBRD footage from the cameras of Lt. Chavez and

Officers King and Agner, show a rifle shot heard at 23:14:48.  Defendants' UMF 67, Exs. L, O,

U, X.  OBRD footage from the cameras of Officers Beem, Lopez, Rogillio, and Sgt. Griffin

show a rifle shot is heard at the time stamp of 23:14:50.  Defendants' UMF 68, Exs. M, S, P, R.

On the Ring camera surveillance video from the 10416 Coyote Canyon Place NW residence, the

rifle shot can be heard at the time stamp 23:14:52.  Defendants' UMF 69, Ex. Y.  After Officer

Willsey fired a shot at Mr. Cordova, the officers next to Lt. Chavez's vehicle moved to the side

of the black SUV parked at the southwest corner of Coyote Canyon and Pony Hills.  Defendants'

UMF 70, Ex. F at 188:3-25; Exs. 49 and V at 18:07-18:25.  Lt. Chavez drove his police car to the

black SUV so that officers could use it for cover as they approached the residence at 10416

Coyote Canyon Place NW.  Defendants' UMF 71, Ex. F at 189:1-8; Ex. V at 19:15-20:15.  Once

officers reached the residence at 10416 Coyote Canyon Place NW, the firearm Juan Cordova was

holding when Officer Willsey shot him was to the right of his body.  Defendants' UMF 72, Ex.

V at 20:15-20:18; Ex. V1 at 20:17; Ex. V2 at 20:18.  An officer kicked the firearm away from

Mr. Cordova so officers could secure him and render aid.  *Id.*  A rescue unit arrived to provide

medical attention to Mr. Cordova but were unable to revive him.  Defendants' UMF 73, Ex. T at

45:04-52:71.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is material if it could have an effect on the outcome of the suit.  *See Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 538 (10th Cir. 2014).  "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*  (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Shapolia v. Los Alamos Nat. Lab'y*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its initial burden, the non-movant cannot "rest on the pleadings[,] but must set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and the moving party will be entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

On summary judgment, a court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *See Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007).  A court cannot weigh the evidence and determine the truth of the matter, but instead, must determine whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Romero v. Story,* 672 F.3d 880 (10th Cir. 2012).

Once a defendant asserts a defense of qualified immunity, the burden shifts to the plaintiff to show that the law and facts at issue establish that qualified immunity does not apply.

*Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1026 (10th Cir. 1994).  The plaintiff must come

forward with sufficient evidence to show that the defendant violated a constitutional or statutory

right, and that the right was clearly established at the time of the conduct such that it would be

sufficiently clear to a reasonable official that his conduct violates that right.  *Thomas v. Kaven*,

765 F.3d 1183, 1194 (10th Cir. 2014).  The essential inquiry is whether an objectively reasonable

official would have known that his conduct was unlawful.  *Lawrence v. Reed*, 406 F.3d  1224,

1230 (10th Cir. 2005).

**DISCUSSION**

Defendants argue Defendant Willsey is entitled to qualified immunity and judgment as a

matter of law as to Plaintiff's excessive force claim in Count I.  Based on the undisputed facts of

the case, Defendant Willsey is entitled to qualified immunity as to Count I.

## I.      Count I – Excessive Force by Use of Deadly Force in Violation of the Fourth Amendment

Defendant Bryce Willsey first contends that he is entitled to summary judgment on

Plaintiff's constitutional claim in Count I based on a qualified immunity defense.  *See* Doc. 20 at

13.  Defendants argue that summary judgment must be granted on Plaintiff's 42 U.S.C. § 1983

claim against Defendant Willsey because even if excessive force were used, he cannot be held

liable for the alleged excessive force violation under the Fourth Amendment under the

circumstances.  *Id*. at 23-24.  Plaintiff asserts qualified immunity does not apply, Defendant

Willsey violated Mr. Cordova's Fourth Amendment rights, and there are genuinely disputed

material facts which preclude the grant of summary judgment.  Doc. 31 at 1-2.

A law enforcement officer is entitled to qualified immunity if the "infringed right at issue

was clearly established at the time of the allegedly unlawful activity such that a reasonable law

enforcement officer would have known that his or her challenged conduct was illegal." *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) (quoting *Martinez v. Carr*, 479 F.3d 1292, 1294-95 (10th Cir. 2007). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001); *Romero v. Story*, 672 F.3d 880, 884 (10th Cir. 2012). The plaintiff must put forward evidence showing that (1) "the defendant's actions violated a constitutional or statutory right," and (2) "the right at issue was clearly established at the time of the defendant's unlawful conduct." *See Medina*, 252 F.3d at 1128 (internal quotations omitted); *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Medina*, 252 F.3d at 1128. In determining whether the plaintiff meets this burden, the Court ordinarily accepts the plaintiff's version of the facts alleged. *See Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (internal quotations omitted). However, at the summary judgment phase of the litigation, "the plaintiff's version of the facts must find support in the record." *Id.* (internal quotations omitted). In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.* unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *Scott v. Harris*, 550 U.S. 372, 378-380 (2007). "However, because at summary

judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . . ." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted). "In short, although [courts] will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina*, 252 F.3d at 1128 (internal citations omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (internal quotations omitted).

The Fourth Amendment protects against unreasonable searches and seizures, U.S. CONST. amend. IV, including a police officer's objectively unreasonable use of lethal force. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). In cases of excessive force, a plaintiff must demonstrate that an officer's actions were "objectively unreasonable." *Larsen*, 511 F.3d at 1259. "Deadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quotation omitted). To assess the objective reasonableness of the force used, courts must weigh the totality of the circumstances as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *United*

States v. Mosley, 743 F.3d 1317, 1329 (10th Cir. 2014) (quoting Graham, 490 U.S. at 396). "[I]n the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." Larsen, 511 F.3d at 1260 (citation omitted).

Whether the use of deadly force is objectively reasonable—that is, whether officers have probable cause to believe that someone poses a serious threat of physical harm to the officers or others—is a fact-dependent question and turns on, among other things, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" from the perspective of the officer on the scene. Mosley, 743 F.3d at 1329 (quoting Graham, 490 U.S. at 396); Henry v. Storey, 658 F.3d 1235, 1239 (10th Cir. 2011). Moreover, factors useful for determining the immediacy and degree of dangers officers face include, "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." Larsen, 511 F.3d at 1260 (citations omitted).

**A. Plaintiff Has Not Offered Evidence that Defendant Willsey's Actions Violated a Constitutional Right**

Plaintiff asserts Defendant Willsey's use of lethal force was unreasonable under the Graham and Larsen analyses. Doc. 31 at 20. Plaintiff argues officers were not under imminent threat, and Tenth Circuit case law underscores the unconstitutionality of Defendant Willsey's conduct. This Court finds in weighing the Graham and Larsen factors, Plaintiff has not offered

sufficient evidence to show that Defendant Willsey violated Mr. Cordova's Fourth Amendment rights.  *See Medina*, 252 F.3d at 1128; *Davis*, 825 F.3d at 1135.

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard.'"  *Pauly*, 874 F.3d at 1214-15 citing, *Graham*, 490 U.S. at 395.  In cases of excessive force, a plaintiff must prove an officer's actions were "objectively unreasonable."  *Est. of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020) citing, *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id*. citing, *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others. This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes. The Constitution is not blind to the fact that police officers are often forced to make split-second judgments."  *Id*. citing, *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775, 191 L.Ed.2d 856 (2015) (citations and internal quotation marks omitted); *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) ("The [officer's] belief need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable.").

In applying the *Graham* factors to determine whether Defendant Willsey used excessive force, this Court finds these factors weigh in favor of Defendant Willsey.[2]  As to the first *Graham* factor, the severity of the crime at issue, here, the principal crime investigated by police was aggravated assault.  Defendants' UMF 10.  "When the crime at issue is a felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have a high degree of severity which weighs against the plaintiff."  *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023); *see also Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 763–64 (10th Cir. 2021).

Here, aggravated assault, a potential felony, underscores the serious threat Mr. Cordova could have posed possibly necessitating the use of deadly force.  Defendants cite *Thomson v. Salt Lake Cnty.* to illustrate the severity of the crime at issue.  In *Thomson*, the Tenth Circuit held it was reasonable for officers to believe Mr. Thomson posed an immediate threat to them or others in the neighborhood given his possession of a firearm, threats he made against his wife, and defying police instructions to put down the firearm.  *Thomson*, 584 F.3d at 1318.  Police observed Mr. Thomson erratically moving his firearm, including aiming it at officers at one point.  *Id*.  Here, from the perspective of Officer Willsey, he was aware Mr. Cordova was armed, that he had fired a round in the house, possibly posed a threat to police, potentially committed a felony, had defied police commands to disarm, and that the neighborhood had not been evacuated.  UMFs 37, 39, 44, 58; *Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011).  Therefore, this Court finds the first factor weighs against Plaintiff.

---

[2] While a court should consider all three factors, generally, the second factor – immediate threat to safety – is considered the most important in determining reasonableness of force.  *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017).

As to the third *Graham* factor, whether the individual was actively resisting arrest or attempting to evade arrest by flight, this Court finds this factor weighs against Plaintiff. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.  Here, from Officer Willsey's perspective, Mr. Cordova refused to comply with numerous police commands to drop his weapon and surrender throughout the armed standoff with police.  UMFs 42, 58; *Henry*, 658 F.3d at 1239; *Valverde*, 967 F.3d at 1061.  Mr. Cordova refused to surrender and repeatedly threatened his own life, daring police to shoot him.  UMFs 57, E.  Furthermore, the standoff between police and Mr. Cordova took place in a residential neighborhood that had not been evacuated.  UMF 44. Therefore, this Court finds the third *Graham* factor weighs against Plaintiff.

Regarding the second *Graham* factor, the decisive question is whether Officer Willsey, from his perspective, was reasonable in believing that Mr. Cordova was going to fire his gun at him or other officers.  This Court finds, when accepting Plaintiff's version of the facts alleged as found in the record and based on the totality of the circumstances, Defendant Willsey's belief of imminent harm was objectively reasonable.  In determining objective reasonability and the immediacy and degree of danger faced by officers, the Tenth Circuit has set forth factors to be weighed: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260.[3]

As to the first *Larsen* factor, a suspect's compliance with police commands, the record supports a finding that Mr. Cordova defied police commands to surrender and drop his firearm. *Id.*; UMFs 30, 33, 39, 42, 58; Doc. 31 at 20, 24; Ex. 46; Ex. 47.  Despite these orders, Mr.

---

[3] The *Larsen* factors may be useful in assessing the degree of danger and immediacy of a threat facing officers but need not be satisfied or mechanically applied. *Dodge*, 967 F.3d at 1061.

Cordova continued his standoff with police, threatening his own life and goading police to shoot him.  UMFs 57, 58; Doc. 21, Ex. Y at 03:43-04:15.  Here, while the record does not support a finding that Mr. Cordova attempted to escape, this first *Larsen* factor weighs in favor of Defendant.  *See Est. of Taylor*, 16 F.4th at 765-66.

The crux of Plaintiff's argument lies in the remaining *Larsen* factors.  Plaintiff asserts that Mr. Cordova barricaded himself, and twenty-seven minutes had passed between when he originally pointed his firearm towards police and when Officer Willsey fatally shot him, contrary to Defendants' claim.  Doc. 31 at 20-21.  Defendants argue that Mr. Cordova had in fact pointed his firearm towards officers several times throughout the standoff, including just before Officer Willsey shot him.  Doc. 20 at 16-17.  Therefore, according to Plaintiff, there is a genuine dispute of material fact and summary judgment cannot be granted.  Doc. 31 at 21.

As to the second *Larsen* factor, whether any hostile motions were made with the weapon towards the officers, this Court finds the second factor weighs in favor of Defendant Willsey.  While the precise number of hostile motions is in dispute, Plaintiff admits, and the record supports a finding that Mr. Cordova made at least one hostile motion with his firearm towards police by pointing his gun towards them.  UMF 37, Doc. 31 at 4; UMF I.  Plaintiff further admits that Mr. Cordova discharged a firearm outside his truck during the standoff with police, in addition to the round fired in the house prior to police arrival.  UMF 51; Doc. 31 at 5.  Furthermore, the record contradicts Plaintiff's claim that Mr. Cordova's discharge of the weapon was accidental. *See* Doc. 33 at 5-6 citing, Doc. 21, Ex. X at 03:56-03:57, 04:00-04:01.  From Officer Willsey's perspective, he believed Mr. Cordova fired the second shot after seeing him move; nearby Officer Sanchez was startled by the gunshot.  UMFs 48 and 49; Ex. F at 178:1-

179:11, 182:3-11.  These hostile actions, within the broader context of an escalating standoff with police, weigh in favor of Defendant Willsey.

Plaintiff first directs this Court to *Pauly v. White* in his assertion that the second *Larsen* factor weighs in his favor and therefore, summary judgment should be denied.  In *Pauly*, the Tenth Circuit found that the second *Larsen* factor weighed in favor of the officer because the record reflected that Mr. Pauly had pointed a handgun at the officer or at least in his direction. 874 F.3d at 1216.  Here, it is undisputed that Mr. Cordova pointed his firearm towards police on at least one occasion.  Defendants' UMF 37, UMF I.  Furthermore, this case is distinguished from *Pauly* in several ways as to the second *Larsen* factor.  Unlike *Pauly*, where it was disputed whether Mr. Pauly fired his weapon, here, it is undisputed that Mr. Cordova discharged his firearm – once in the residence prior to the standoff and again during the standoff with police. *Pauly*, 874 F.3d at 1217; Defendants' UMFs 6, 47.  Secondly, unlike *Pauly*, it is undisputed that officers ordered Mr. Cordova on several occasions to drop his firearm, which he refused to do. Defendants' UMF 30; *Pauly*, 874 F.3d at 1217.  While *Pauly* concluded that "since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story – the person shot dead – is unable to testify'", this Court does not find similar concerns apply to this case. *Pauly*, 874 F.3d at 1218 citing, *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) citing, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  Here, while it is disputed specifically how many times Mr. Cordova pointed his firearm towards police and why he discharged his weapon during the standoff, this Court does not find similar credibility concerns, as the parties agree on critical material facts as previously outlined.  Nor as in *Pauly* are there such clear factual contradictions or an indication that Officer Willsey is taking advantage of Mr. Cordova's

inability to testify.  *Pauly*, 874 F.3d at 1218.  Thus, under the second *Larsen* factor, when the evidence is viewed in the light most favorable to Plaintiff, this Court finds Mr. Cordova made hostile motions with his weapon towards police.  Therefore, this second *Larsen* factor weighs in favor of Plaintiff.

The third *Larsen* factor, the distance between officers and the suspect, favors Plaintiff. Here, Defendants concede that the distance between Mr. Cordova and the officers is arguably its weakest factor since the two were not within arm's reach.  Doc. 20 at 21.  However, according to Defendants, the distance between the two does not lessen the threat and directs this Court to *Valverde*.  Viewing the facts in the light most favorable to Plaintiff, the Court finds the distance between officers and Mr. Cordova favors Plaintiff.  Here, Plaintiff alleges police were 50 yards (150 feet) away from Mr. Cordova, with Defendant Willsey positioned 65 yards (195 feet) away. Doc. 31 at 2, 14.  Nor does the record blatantly contradict Plaintiff's distance estimate as Defendants assert.  (Doc. 20, Exs. 46 and 47).  In *Pauly*, the Tenth Circuit held that where the officer in question described himself as positioned behind a stone wall and fifty feet away from Mr. Pauly, this distance and therefore, the third *Larsen* factor, favored Plaintiff.  *Pauly*, 874 F.3d at 1218.  Here, when Defendant Willsey fatally shot Mr. Cordova, he too was in a covered position.  UMF 48.  Unlike *Valverde*, where the Tenth Circuit found the third factor weighed in favor of the defendant, Mr. Cordova and Officer Willsey were far greater than a car length apart. *Valverde*, 967 F.3d at 1065.  Therefore, this Court finds the third *Larsen* factor favors Plaintiff.

As to the fourth and final *Larsen* factor, the manifest intentions of the suspect, this Court finds this factor weighs in favor of Defendant.  Plaintiff asserts Mr. Cordova's manifest intentions throughout this ordeal were to be shot by police, not to shoot them.  Doc. 31 at 21. Defendants do not specifically argue this factor favors Officer Willsey, but rather claim that

throughout the standoff, Mr. Cordova's actions manifested threats to both officers and the neighborhood. Doc. 20 at 17. During the standoff with police, Mr. Cordova was allegedly in the midst of a mental health crisis, intoxicated, and repeatedly made statements to police threatening his own life and daring them to shoot him. Docs. 31 at 20, 32; 33 at 27 citing, Doc. 21 Ex. Y at 03:43-04:15; Defendants' UMF 58, Ex. B at 23:09:11, 23:09:49; Ex. C at 20:11-15; Ex. L at 33:06-33:17. Throughout the standoff, APD announced its presence numerous times and actively communicated with Mr. Cordova encouraging him to surrender and guarantee his safety, demanding that he surrender, which he refused to do.[4] Doc. 33 at 27 citing, Doc. 21 Ex. X, X1; UMFs 30 and 31 citing, Ex. L at 12:06-13:19, 13:49-1401, 31:57-32:32, 37:08-37:39; 38:16-39:29; Ex. T at 15:09-15:26, 15:33-15:47, 16:04-16:33, 16:49-17:05, 18:19-18:50, 24:33-25:38. Accordingly, when viewing the evidence in the light most favorable to Plaintiff, this Court finds the manifest intentions of Mr. Cordova were to make hostile motions towards police as discussed in the second *Larsen* factor analysis and to ultimately be shot and killed by police through his refusal to surrender. Therefore, this factor favors Defendant.

Having weighed the *Larsen* factors to determine whether Mr. Cordova posed an immediate threat to the safety of the officers or others, courts are required to also consider "that allowance needs to be made for the fact that the officer must make a split-second decision." *Valverde*, 967 F.3d at 1062. Furthermore, a court must view the facts from the perspective of the officer. *Id.* In viewing the facts from the perspective of Officer Willsey and the necessity of split-second decision making, this Court finds Mr. Cordova posed an immediate threat to the

---

[4] Unlike *Pauly*, where the Tenth Circuit found the fourth *Larsen* factor favored plaintiffs, here, officers announced their presence numerous times during their standoff with Mr. Cordova. Doc. 33 at 27.

safety of officers or others as to the second *Graham* factor.[5]  Mr. Cordova actively resisted

arrest, the crime at issue was a felony, and from Officer Willsey's perspective and considering

split-second decision making and the totality of the circumstances, Officer Willsey had probable

cause to believe Mr. Cordova posed an immediate threat to his safety, other officers, or others in

the immediate vicinity.  From Officer Willsey's perspective, the totality of the circumstances,

and Plaintiff's version of the facts as "judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight," Officer Willsey's decision to shoot Mr.

Cordova was objectively reasonable.  That night, Officer Willsey and APD were engaged in an

escalating standoff in a residential neighborhood with Mr. Cordova, a potentially unstable and

armed man, accused of a felony and resisting arrest, who was flailing a firearm that he pointed

towards officers on at least one occasion, and had previously fired two rounds.  Even if Officer

Willsey's belief was incorrect and in retrospect the force he used may seem unnecessary, his

decision to fire at Mr. Cordova was reasonable, and officers are permitted to make reasonable

mistakes.  *Valverde*, 967 F.3d at 1060, 1062 citing, *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th

Cir. 2015); *Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1995).

    In sum, this Court finds when weighing the *Graham* factors, Plaintiff has not offered

evidence showing that Defendant Willsey's actions violated a constitutional or statutory right.

*Medina*, 252 F.3d at 1128.   In accepting Plaintiff's facts as asserted and properly supported in

the record, this Court has found that the use of deadly force against Mr. Cordova was objectively

reasonable when weighing the severity of the crime, the immediate threat to the safety of officers

---

[5] The second *Graham* factor, "is undoubtedly the "most important" and fact intensive factor in determine the objective reasonableness of an officer's use of force."  *Pauly*, 874 F.3d at 1215-16 citing, *Bryan v. MacPherson*, 930 F.3d 805, 826 (9th Cir. 2010).

or others, and whether Plaintiff actively resisted arrest.  Therefore, this Court finds Plaintiff has

failed to satisfy the first part of the two-part qualified immunity inquiry.

**B.  The Law Was Not Clearly Established at The Time of Defendant Willsey's**
    **Conduct**

Alternatively, even if Plaintiff satisfied the first prong, this Court now turns to whether

the right at issue was clearly established at the time of Defendant Willsey's unlawful conduct.

"A clearly established right is generally defined as a right so thoroughly developed and

consistently recognized under the law of the jurisdiction as to be 'indisputable' and

'unquestioned.' " *Lobozzo v. Colo. Dep't of Corr.*, 429 F.App'x 707, 710 (10th Cir. 2011).  "For a

right to be clearly established there must be Tenth Circuit or Supreme Court precedent close

enough on point to make the unlawfulness of the officers' actions apparent."  *Mascorro v.*

*Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741,

131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).  "For a constitutional right to be clearly established,

its contours must be sufficiently clear that a reasonable official would understand what he is

doing violates that right."  *Pauly*, 874 F.3d at 1222 citing, *Hope*, 536 U.S. at 739, 122 S.Ct.

2508; *Ashcroft*, 563 U.S. at 741.  "[Q]ualified immunity protects 'all but the plainly incompetent

or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L.Ed.2d

255 (2015) citing, *Malley v. Briggs*, 475 U.S.335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

While there need not be a case directly on point, "existing precedent must have placed the

statutory or constitutional question beyond debate."  *Mullenix*, 136 S.Ct. at 308 quoting, *al-Kidd*,

563 U.S. at 741.  In other words, precedent must show "whether the violative nature of particular

conduct is clearly established" and there must be a case "close enough on point to make the

unlawfulness of [an officer's] actions apparent."  *Id*. at 1223; *Pauly I*, 814 F.3d at 1091.

31

Defendants assert that the law is not clearly established that Officer Willsey committed a constitutional violation, which is supported by several Tenth Circuit decisions.[6]  Doc. 20 at 24-25.  Plaintiff contends that the law is clearly established that Officer Willsey's actions violated Mr. Cordova's rights.  Doc. 31 at 28-29; *Pauly,* 580 U.S. 73, 79 (2017); *Thomson*, 584 F.3d 1304*; Phillips*, 422 F.3d 1075, *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020); *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013); *Aleman v. City of Charlotte*, 80 F.4th 264, 291–92 (4th Cir. 2023), among others.  This Court agrees with Defendants and finds that the law is not clearly established that Officer Willsey violated Mr. Cordova's constitutional rights.

In asserting that the law is clearly established as to a violation of Mr. Cordova's constitutional rights, Plaintiff first relies on *Pauly*, which he claims held that "when officers are behind cover and the suspect is not an imminent threat, shooting at that moment in time violates the Fourth Amendment."  Doc. 31 at 27.  As to Plaintiff's assertion that *Pauly* clearly established Officer Willsey's conduct as a violation of Mr. Cordova's constitutional rights, this Court rejects that argument, finding *Pauly* factually dissimilar to this case.  In *Pauly*, in responding to a 911 call regarding an intoxicated driver, officers proceeded to an address and saw two males moving inside the house.  *Pauly*, 874 F.3d at 1204.  The Pauly brothers were terrified and confused as to how police approached their home, believing the officers were possibly intruders from an earlier road rage altercation.  *Id*.  Daniel Pauly did not hear the officers identify themselves, but rather heard demands to open up.  *Id*.  The brothers called police to report the purported intruders and retrieved their firearms.  *Id*.  One of the officers drew his gun and hid behind a stone wall roughly fifty feet away from the house.  *Id*.  Daniel Pauly fired two warning shots.  *Id*.  Officer

---

[6] Including *Thomson*, 584 F.3d 1304*; Phillips*, 422 F.3d 1075; *Valverde*, 967 F.3d 1049; *Larsen*, 511 F.3d 1255.

White thought Officer Truesdale had been shot and shortly thereafter, Officers Mariscal and White observed Samuel Pauly point a handgun in their direction. *Id*. Officer Mariscal immediately shot at Samuel Pauly but missed, with Officer White then successfully shooting him from his position roughly fifty feet away. *Id*. In its entirety, this incident happened in less than five minutes. *Id*.

Here, this case is distinguishable from *Pauly* in several ways. Mr. Cordova was engaged in an armed standoff with police in a residential neighborhood, having made hostile motions towards police, daring them to kill him. Mr. Cordova, undergoing a mental health crisis and potentially intoxicated during his standoff with police, was likely aware of APD and who they were through repeated identification. Doc. 33 at 27 citing, Doc. 21 Ex. X, X1; UMFs 30 and 31 citing, Ex. L at 12:06-13:19, 13:49-1401, 31:57-32:32, 37:08-37:39; 38:16-39:29; Ex. T at 15:09-15:26, 15:33-15:47, 16:04-16:33, 16:49-17:05, 18:19-18:50, 24:33-25:38. Aside from these significant factual differences, officers in *Pauly* recklessly created the dangerous situation they found themselves in and purportedly did not identify themselves as officers to the Pauly brothers. *Pauly*, 874 F.3d at 1221. Unlike *Pauly*, the parties do not dispute that Mr. Cordova was aware of the police presence, that he pointed a firearm towards police on at least one occasion, fired it, and was ordered by police to surrender. UMFs 47, 50, I. Furthermore, Plaintiff asserts *Pauly* provided notice to Officer Willsey of a clearly established right. However, given the *significant* factual differences between this case and *Pauly*, this Court does not find it to be on point for the purposes of clearly establishing a right when viewing the facts in the light most favorable to Plaintiff. *al-Kidd*, 563 U.S. at 741, 131 S.Ct. 2074. Viewing this case through *Pauly v. White* and its holding, it is not clear how Mr. Cordova's right was "sufficiently clear that a reasonable government employee would understand that what he or she did violated a right." *O'Farrell v.*

*Bd. of Commissioners for Cnty. of Bernalillo*, 455 F. Supp. 3d 1172, 1202 (D.N.M. 2020) citing,

*Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007).  To hold that

*Pauly* provided Officer Willsey adequate notice would be unreasonable.  While a court's analysis

need not be a scavenger hunt with precisely the same facts and conduct, this Court finds Officer

Willsey, through *Pauly*, was not on notice that his conduct violated established law.  *Packard v.*

*Budaj*, 86 F.4th 859 (10th Cir. 2023) citing, *Reavis*, 967 F.3d at 992 citing, *Est. of Smart ex rel.*

*Smart v. City of Wichita*, 951 F3d 1161, 1168 (10th Cir. 2020)); *Romero v. Story*, 672 F.3d 880,

889 (10th Cir. 2012).

Next, Plaintiff asserts that another Tenth Circuit case, *Phillips v. James,* also

demonstrates that the law was clearly established that Officer Willsey used excessive force when

he fatally shot Mr. Cordova.  Doc. 31 at 24.  In *Phillips*, police responded to a 911 call regarding

a marital dispute.  *Phillips*, 422 F.3d at 1078-79.  Mr. Philips barricaded himself in a bedroom

located in a house with numerous firearms.  *Id*.  Officers attempted to speak with Mr. Phillips,

who appeared agitated, through the bedroom door.  *Id*.  One officer believed he heard shells

being loaded into a shotgun and subsequently, officers attempted to enter by turning the

doorknob.  *Id*.  Mr. Phillips purportedly stated that if anyone entered, they would be sorry,

including threatening Chief James, stating he would fire five shotgun shells into the door.  *Id*.

SWAT arrived and set up a post in a tree near the room where Mr. Phillips was located.  *Id*.  As

the situation and dialogue between Mr. Phillips and officers escalated, Mr. Phillips indicated he

had been drinking.  *Id*.  As the standoff continued, Sgt. Adamson believed Mr. Phillips was

preparing to fire at the SWAT team through a window.  *Id*.  After Mr. Phillips shouted that he

had a clean shot on SWAT officers, Sgt. Adamson shot Mr. Phillips.  *Id*.  Ultimately, the court in

*Phillips* rejected the plaintiff's excessive force argument, finding Sgt. Adamson's decision to

shoot Mr. Philips reasonable.  *Id*. at 1083.  Plaintiff argues unlike *Philips*, this case deescalated considerably, Mr. Cordova did not threaten to shoot police, was not an active threat, and had not pointed his firearm at police for twenty-seven minutes when he was shot.  Doc. 31 at 26.

Here, unlike *Phillips*, Mr. Cordova was located outside, behind a vehicle near an illuminated garage, instead of inside a house.  Mr. Cordova made at least two hostile motions towards police with his firearm.  Unlike Mr. Cordova, Mr. Phillips was shot by SWAT and from an officer perched in a tree just outside Mr. Phillips location upon Mr. Philips' stating he had a "clean shot", instead of at a distance of 50 yards as Plaintiff asserts.  As such, *Phillips* and this case are factually dissimilar.  Plaintiff asserts *Phillips* provided notice to Officer Willsey of a clearly established right.  Given the significant factual discrepancies between this case and *Phillips*, this Court does not find it on point for the purposes of clearly establishing a right when viewing the facts in the light most favorable to Plaintiff.  *al-Kidd*, 563 U.S. at 741, 131 S.Ct. 2074.  Viewing this case through *Phillips* and its holding, it is not clear how Mr. Cordova's right was "sufficiently clear that a reasonable government employee would understand that what he or she did violated a right."  *O'Farrell*, 455 F. Supp. 3d at 1202 citing, *Casey*, 473 F.3d at 1327.

In addition to *Pauly* and *Phillips*, Plaintiff asserts case law in other circuits also demonstrates that it is clearly established that Mr. Cordova's rights were violated.  Plaintiff does not argue that the circuit cases it cites are factually similar to this case, but rather to demonstrate that "it is clearly established that police cannot shoot an armed suspect who is not posing an immediate threat of using his firearm on officers or others."  Doc. 31 at 28.  In considering the cases Plaintiff cites, this Court finds Plaintiff has failed to establish that the overwhelming weight of other circuits favor his position.  Plaintiff cites cases from two circuits, *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020) citing, *Cooper v. Sheehan*, 735 F.3d 153

(4th Cir. 2013) and *Aleman v. City of Charlotte*, 80 F.4th 264 (4th Cir. 2023) in supporting his proposition that it is clearly established that "an individual does not pose an immediate threat of serious physical harm to others when, although that person is seemingly in possession of a gun, he does not raise it toward another or otherwise  appear 'ready to shoot' in the moment."  Doc. 31 at 28-29 citing, *Hutchins*, 959 F.3d at 1134.  Plaintiff further cites *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016); *George v. Morris*, 736 F.3d 829 (9th Cir. 2013); *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012); *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989); *Lytle v. Bexar Cty.*, 560 F.3d 404 (5th Cir. 2009); *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005); *Ellis v. Wynalda*, 999 F.2d 243 (7th Cir. 1993) as proof of a clearly established right.  "Clearly established law" for the purposes of qualified immunity cannot be defined at a "high level of generality," but rather, be particularized to the facts of a case.  *Pauly*, 580 U.S. at 79; *Kisela*, 138 S.Ct. at 1152.  Here, Plaintiff neither argues nor explains how these cases are particularized and similar to Mr. Cordova's case.  Instead, he offers generalized statements of law regarding excessive force.  Doc. 31 at 28-30.

As such, this Court finds Plaintiff has failed to clearly establish a right for the purposes of qualified immunity.  Plaintiff has not demonstrated that Mr. Cordova had a right "so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" *Lobozzo*, 429 F.App'x at 710.  Plaintiff has not provided Tenth Circuit or Supreme Court precedent on point and particularized to this case to establish the unlawfulness of Officer Willsey's actions.  *Mascorro*, 656 F.3d at 1208; *Ashcroft*, 563 U.S. at 741.  From the case law Plaintiff cited, in addition to failing to clearly establish a right, Plaintiff has not demonstrated that Officer Willsey was "plainly incompetent…[or] knowingly violate[d] the

law." *Mullenix*, 136 S.Ct. at 308; *Malley*, 475 U.S. at 341.  Plaintiff has not shown how the case

law it cites gave Defendant Willsey sufficient notice of the unlawfulness of his actions.

### C.  Defendant Willsey is Entitled to Qualified Immunity Defense

In sum, when a defendant moves for summary judgment on the basis of qualified

immunity, a plaintiff must offer evidence that (1) a defendant's actions violated a constitutional

or statutory right, and (2) the right at issue was clearly established at the time of the unlawful

conduct.  *Medina*, 252 F.3d at 1128; *Davis*, 825 F.3d at 1135.  In accepting Plaintiff's version of

the facts as supported in the record, this Court finds Officer Willsey's actions did not violate Mr.

Cordova's Fourth Amendment rights.  *Halley*, 902 F.3d at 1144.  Furthermore, Plaintiff has

failed to demonstrate that Mr. Cordova's right at issue was clearly established at the time of the

purported unlawful conduct.  *Medina*, 252 F.3d at 1128; *Davis*, 825 F.3d at 1135.  Because

Plaintiff has failed to satisfy both parts of the qualified immunity inquiry, this Court must grant

Defendant Willsey qualified immunity and judgment as a matter of law as to Plaintiff's excessive

force claim asserted in Count I.  *Medina*, 252 F.3d at 1128.[7]

### II.   Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claims

Defendants removed this case to this Court on the basis of federal question jurisdiction

over Count I.  No party has asserted diversity jurisdiction.  While Plaintiff contends its remaining

state law claims arise from the same incident, Counts II, III, and IV, arise from state statutes.

Plaintiff's remaining state law claims do not "turn on substantial questions of federal

law."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312, 125 S.Ct.

---

[7] Because Plaintiff has not met both parts of the qualified immunity two-part test, Defendant does not bear the additional and traditional burden of a summary judgment movant: establishing there are no genuine issues of material fact and entitlement to judgment as a matter of law.  *Nelson*, 207 F.3d at 1206.

2363, 162 L.Ed.2d 257 (2005).  Under *Grable*, "a federal court [is] able to hear claims

recognized under state law that nonetheless turn on substantial questions of federal law, and thus

justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on

federal issues." *Grable*, 545 U.S. at 312.  That is to say, "federal jurisdiction over a state law

claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and

(4) capable of resolution in federal court without disrupting the federal-state balance approved by

Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  Here, any "federal interest is not critical

enough to trigger substantial-question jurisdiction because… whatever federal issues exist do not

fundamentally change the state tort nature of the action."  *Bd. of Cnty. Commissioners of Boulder*

*Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1270 (10th Cir. 2022), cert. denied, 143 S.

Ct. 1795, 215 L. Ed. 2d 678 (2023) (quotation marks and citation omitted).

Moreover, neither party asserts nor does record suggest that diversity jurisdiction exists.

Defendants did not remove on the basis of diversity jurisdiction.

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental

jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining

jurisdiction.

Furthermore, "[n]eedless decisions of state law should be avoided both as a matter of

comity and to promote justice between the parties, by procuring for them a surer-footed reading

of applicable law. Certainly, if the federal claims are dismissed before trial, even though not

insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine*

*Workers of Amer. v. Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 (footnote omitted).  Therefore, this Court, in its discretion, declines to exercise supplemental jurisdiction over the state law claims.[8]

When declining to exercise supplemental jurisdiction, a district court may dismiss the state law claims without prejudice or remand the claims to state court.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351, 108 S. Ct. 614, 619, 98 L. Ed. 2d 720 (1988).  Because this case was removed to this court from state court, the Court finds remand of the state law claims, rather than dismissal, appropriate.

## CONCLUSION

For the reasons stated above, the Court grants Defendant Willsey qualified immunity and judgment as a matter of law as to Plaintiff's excessive force claim in Count I.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and remands those claims to the Second Judicial District Court for the State of New Mexico, County of Bernalillo.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 20) is hereby **GRANTED IN PART** as described above.

**IT IS FINALLY ORDERED** that the Court declines to exercise supplemental jurisdiction over the remaining state law claims against Defendants and **REMANDS** those state law claims to the Second Judicial District Court for the State of New Mexico, County of Bernalillo.  The Clerk of Court is directed to take the necessary actions to remand this case.

/s/
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

---

[8] Plaintiff specifically asserts its Count I claim under 42 U.S.C. § 1983.  Plaintiff argues Counts II-IV are state tort claims and have been brought under state law.  *See* Doc. 31 at 32-34.  Plaintiff has not asserted that Counts II-IV are brought under federal law, nor did Plaintiff indicate as such in the original or amended Complaints.